UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

FEB 12 2013

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MICHAEL BATEMAN, individually
and on behalf of all others similarly
situated,

         Plaintiff - Appellant,

  v.

AMERICAN MULTI-CINEMA, INC.,

         Defendant - Appellee.

No. 09-55108

D.C. No. 2:07-cv-00171-FMC-AJW

U.S. District Court for Central
California, Los Angeles

**MANDATE**



**RECEIVED**
CLERK, U.S. DISTRICT COURT

2/12/13

CENTRAL DISTRICT OF CALIFORNIA
BY: _____MAT_____ DEPUTY

       The judgment of this Court, entered September 27, 2010, takes effect this

date.

       This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

                           FOR THE COURT:
                           Molly C. Dwyer
                           Clerk of Court

                           Synitha Walker
                           Deputy Clerk

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL BATEMAN, individually
and on behalf of all others
similarly situated,

*Plaintiff-Appellant,*

v.

AMERICAN MULTI-CINEMA, INC.,

*Defendant-Appellee.*

No. 09-55108

D.C. No.
2:07-cv-00171-
FMC-AJW

OPINION

Appeal from the United States District Court
for the Central District of California
Florence-Marie Cooper, District Judge, Presiding

Argued and Submitted
May 4, 2010—Pasadena, California

Filed September 27, 2010

Before: Betty B. Fletcher and Richard A. Paez,
Circuit Judges, and Donald E. Walter, Senior District Judge.*

Opinion by Judge Paez

---

*The Honorable Donald E. Walter, Senior United States District Judge
for the Western District of Louisiana, sitting by designation.

16357

**COUNSEL**

Gregory N. Karasik, Spiro Moss LLP, Los Angeles, California, for plaintiff-appellant Michael Bateman.

Robert H. Platt, Manatt, Phelps & Phillips LLP, Los Angeles, California, for defendant-appellee American Multi-Cinema, Inc.

Adel James Chareq, Hudson Cook LLP, Washington D.C., for amicus curiae Consumer Data Industry Association.

**OPINION**

PAEZ, Circuit Judge:

   In this Fair and Accurate Credit Transactions Act ("FACTA") case, Plaintiff-Appellant Michael Bateman appeals the district court's denial of class certification. Bateman sued American Multi-Cinema, Inc., ("AMC") on behalf of a class of similarly situated individuals, alleging that AMC violated FACTA by printing more than the last five digits of consumers' credit or debit card numbers on electronically printed receipts in December 2006 and January 2007. *See* 15 U.S.C. § 1681c(g) (2005). On behalf of himself and other consumers who received such receipts, Bateman sought to recover statutory damages ranging from $100 to $1,000 for

each willful violation of FACTA. The district court denied
class certification under Federal Rule of Civil Procedure
23(b)(3) ("Rule 23(b)(3)"), finding that a class action was not
the superior method of litigating the case because AMC had
made a good faith effort to comply with FACTA after this
lawsuit was filed and the magnitude of AMC's potential
liability—$29 million to $290 million—was enormous and
out of proportion to any harm suffered by the class. *See Bate-
man v. Am. Multi-Cinema, Inc.*, 252 F.R.D 647, 648, 650-51
(C.D. Cal. 2008) (order). Bateman appeals, arguing that the
district court abused its discretion in denying class certifica-
tion. We agree that none of these three grounds—the dispro-
portionality between the potential liability and the actual harm
suffered, the enormity of the potential damages, or AMC's
good faith compliance—justified the denial of class certifica-
tion on superiority grounds and that the district court abused
its discretion in relying on them. We therefore reverse the
denial of class certification and remand for further proceed-
ings.

# I

In 2007, Bateman filed a complaint against AMC, on
behalf of himself and those individuals similarly situated,
alleging violations of FACTA. Bateman alleged that from
December 2006 to January 2007, AMC issued credit and debit
card receipts from some of its automated box offices that
included both the first four and the last four digits of the credit
card, a violation of FACTA. To protect against identity theft,
FACTA requires, in relevant part, that credit and debit card
receipts issued to consumers not reflect the expiration date or
more than the last five digits of the card number. *See* 15
U.S.C. § 1681c(g)(1). FACTA incorporates the Fair Credit
Reporting Act's ("FCRA") statutory damages provision,
which allows a consumer to recover damages between $100
and $1,000 for each willful[1] violation of FACTA without hav-

---

[1] A "willful" violation under the FCRA includes "not only knowing vio-
lations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v.*

ing to prove actual damages. *See id.* § 1681n. In the complaint, Bateman did not allege any actual harm to his identity resulting from the claimed violations.

After conducting discovery, Bateman filed a motion for class certification under Rule 23(b)(3). Bateman sought to certify a class of individuals who, between December 4, 2006, and January 29, 2007, had used a credit card or debit card to purchase a movie ticket from an automated box office at an AMC theater and who received a receipt that included the first four and last four digits of the person's credit/debit card number. An AMC internal review conducted after the lawsuit was filed revealed that more than 290,000 receipts had been printed in violation of FACTA during the relevant period.

The district court denied Bateman's motion for class certification without prejudice, concluding that Bateman had failed to demonstrate that a class action would be superior to other available methods of adjudicating his claim, as required under Rule 23(b)(3). In particular, the district court denied certification because, in its opinion, class treatment could result in enormous liability completely out of proportion to any harm suffered by the plaintiff. The district court further concluded that class certification was not appropriate because AMC demonstrated good faith by complying with FACTA within a few weeks of the filing of Bateman's complaint.[2]

---

*Burr*, 551 U.S. 47, 57 (2007). A defendant acts in reckless disregard if the defendant's action "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69. That is, the defendant must have taken action involving " 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.' " *Id.* at 68 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). Where a plaintiff alleges a negligent violation of FACTA, as opposed to a willful one, only actual damages are available. 15 U.S.C. § 1681o.

[2]Within two weeks of the filing of Bateman's complaint, AMC modified its machines to comply with FACTA.

After denying Bateman's motion to certify, the district court approved the parties' stipulation to stay the case pending the outcome of an appeal in a different case raising an issue identical to the one presented here. *See Soualian v. Int'l Coffee & Tea, LLC*, No. CV 07-0502-RGK (JCx), 2008 WL 410618 (C.D. Cal. Feb. 9, 2008). That case, however, settled while the appeal was pending. In the meantime, Congress amended FACTA to address prevalent misunderstandings about FACTA's requirements and to provide businesses some measure of protection from lawsuits resulting from those misunderstandings. *See* Credit and Debit Card Receipt Clarification Act of 2007, Pub. L. No. 110-241, 122 Stat. 1565 (2008) ("Clarification Act"). The district court subsequently instructed the parties to file supplemental briefing on the appropriateness of class certification in light of that amendment. After considering the supplemental briefs, the district court denied with prejudice Bateman's renewed motion for class certification for largely the same reasons as before, although the court additionally noted that, because Bateman had alleged no actual harm, class certification would not further the purpose and policy of FACTA. *See Bateman*, 252 F.R.D at 650. Pursuant to Federal Rule of Civil Procedure 23(f), Bateman petitioned this court for permission to appeal the denial of class certification. We granted his request.

## II

Under Federal Rule of Civil Procedure 23, "[a] class action may be maintained if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b)." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437 (2010) (internal quotation marks omitted). Subdivision (b)(3), at issue in this appeal, is satisfied if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members,

BATEMAN v. AMERICAN MULTI-CINEMA          16365

and that a class action is superior to other available methods
for fairly and efficiently adjudicating the controversy." Fed.
R. Civ. P. 23(b)(3).

The decision to grant or deny class certification is within
the trial court's discretion. *Yamamoto v. Omiya*, 564 F.2d
1319, 1325 (9th Cir. 1977). District courts are "in the best
position to consider the most fair and efficient procedure for
conducting any given litigation," *Doniger v. Pac. N.W. Bell,
Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977), and so must be
given "wide discretion" to evaluate superiority, *Lerwill v.
Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.
1978). We thus review for abuse of discretion a district
court's order denying a motion for class certification. *Zinser
v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.
2001). A district court abuses its discretion when it makes an
error of law. *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594
F.3d 1087, 1091 (9th Cir. 2010). Additionally, in the context
of class certification, "[a]buse exists in three circumstances:
(1) reliance on an improper factor, (2) omission of a substan-
tial factor, or (3) a clear error of judgment in weighing the
correct mix of factors." *In re Wells Fargo Home Mortg. Over-
time Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009).

## III

The district court refused to certify the class because it con-
cluded that the proposed class failed to meet Rule 23(b)(3)'s
superiority requirement. *See Bateman*, 252 F.R.D. at 650-51.
At the heart of its ruling, the district court determined that
class treatment would render the magnitude of the defendant's
potential liability "enormous and completely out of proportion
to any harm suffered by Plaintiff." *Id.* at 651. In its first order
denying class certification without prejudice, the court also
considered significant AMC's good faith efforts to bring its
machines into compliance with FACTA shortly after the law-
suit was filed. We conclude that none of these three grounds
—the disproportionality between the potential liability and the

actual harm suffered, the enormity of the potential damages, or AMC's good faith—justified the denial of class certification and hold that the district court abused its discretion in relying on them.

## A.  Proportionality Between Liability and Actual Harm

The district court denied class certification in part because it concluded that AMC's liability would be "completely out of proportion to any harm suffered by Plaintiff." *Id.* at 651. We therefore must consider whether Rule 23(b) permits consideration of such a factor when deciding whether to certify a class in a FACTA case. We hold that it does not.

**[1]**  Rule 23 provides little, if any, guidance on this question.[3] The rule provides a non-exhaustive list of factors relevant to the superiority inquiry:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

---

[3]We reserve judgment, however, on whether Rule 23(b)(3) *per se* prohibits consideration of a defendant's potential liability in deciding whether to certify a class. Because we conclude that considering such liability contravenes congressional intent under FACTA, we need not decide that broader question.

Fed. R. Civ. P. 23(b)(3). None of these enumerated factors appear to authorize a court to consider whether certifying a class would result in disproportionate damages. A court may consider other, non-listed factors, however, and we have suggested that a broad inquiry is appropriate:

> "Superiority must be looked at from the point of view (1) of the judicial system, (2) of the potential class members, (3) of the present plaintiff, (4) of the attorneys for the litigants, (5) of the public at large and (6) of the defendant. The listing is not necessarily in order of importance of the respective interests. Superiority must also be looked at from the point of view of the issues."

*Kamm v. Cal. City Dev. Co.*, 509 F.2d 205, 212 (9th Cir. 1975) (quoting *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 760 (3d Cir. 1974)). That list, however, leaves two key questions unanswered: (1) what does it mean to look at superiority from "the point of view" of a defendant, and (2) can that inquiry consider whether the defendant's potential liability is proportional to the actual harm alleged?

Nor do the Advisory Committee Notes shed any light on the question. In its Note to Amended Rule 23, the Advisory Committee explains:

> Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about *other undesirable results*.

39 F.R.D. 69, 102-03 (emphasis added). AMC contends that imposing potential enormous and disproportional liability would constitute just such "undesirable results." The Advisory Committee, however, gives no further explanation of

what constitutes an "undesirable result[ ]," or of whether the
term contemplates only procedurally undesirable results (*e.g.*,
prejudicing individual plaintiffs' ability to seek redress) or
also refers to substantively undesirable results (*e.g.*, poten-
tially exposing a defendant to bankruptcy as a result of enor-
mous liability). *Cf. Wolin v. Jaguar Land Rover N. Am., LLC,*
Nos. 09-55104, 09-55105, 2010 WL 3222091, at *6 (9th Cir.
Aug. 17, 2010) ("Rule 23(b)(3)'s superiority test requires the
court to determine whether maintenance of . . . litigation as a
class action is efficient and whether it is fair.").

   **[2]** Although neither the Rule nor its legislative history
clearly expresses whether the proportionality between the
actual harm caused and the defendant's potential liability is a
proper superiority consideration, many courts have assumed
as much. *Ratner v. Chemical Bank New York Trust Co.,* 54
F.R.D. 412 (S.D.N.Y. 1972), was the first and seminal case to
deny class certification for proportionality reasons. There, the
district court denied class certification in a suit against Chem-
ical Bank for disclosure violations under the Truth in Lending
Act ("TILA"). *Id.* at 413, 416. The plaintiff sought to certify
a class of approximately 130,000 cardholders, each of whom
would have been entitled to at least a minimum statutory dam-
ages award of $100 under the statute. *Id.* at 414. In denying
class certification, the district court concluded that a class
action was not the superior method of adjudicating the claim
because the plaintiff had alleged only "technical" violations,
*id.* at 416,[4] and "the allowance of thousands of minimum
recoveries like plaintiff's would carry to an absurd and stulti-
fying extreme the specific and essentially inconsistent remedy
Congress prescribed as the means of private enforcement," *id.*
at 414.

---

   [4]Unlike the "technical" violations alleged in *Ratner*, Bateman has
alleged "willful" violations of FACTA. A "willful" violation is not merely
"technical." In order to prevail in the lawsuit, Bateman must demonstrate
either a "knowing" or "reckless" violation of the Act. *See Safeco,* 551 U.S.
at 57.

Courts have heavily relied on *Ratner*'s reasoning for the proposition that Rule 23(b)(3)'s superiority requirement authorizes consideration of the proportionality between the potential damages and the actual harm.[5] *See, e.g., Klay v. Humana, Inc.*, 382 F.3d 1241, 1271 (11th Cir. 2004); *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 234-35 (9th Cir. 1974); Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336, 347 (10th Cir. 1973). In the context of plaintiffs seeking to certify classes in FACTA cases, *Ratner*'s reasoning has prevailed in the vast majority of district courts within this circuit. *See, e.g., Azoiani v. Love's Travel Stops and Country Stores, Inc.*, No. EDCV 07-90 ODW (OPx), 2007 WL 4811627 (C.D. Cal. Dec. 18, 2007); *Vartanian v. Estyle, Inc.*, No. CV 07-0307 DSF (RCx), 2007 WL 4812286 (C.D. Cal. Nov. 26, 2007); *Saunders v. Trattoria*, No. CV 07-1060 SJO (PJWx), 2007 WL 4812287 (C.D. Cal. Oct. 23 2007); *Price v. Lucky Strike Entm't Inc.*, No. CV 07-960-ODW (MANx), 2007 WL 4812281 (C.D. Cal. Aug. 31, 2007); *Najarian v. Avis Rent A Car Sys.*, No. CV 07-588-RGK (Ex), 2007 WL 4682071 (C.D. Cal. June 11, 2007). *But see Medrano v. WCG Holdings, Inc.*, No. SACV 07-0506 JVS (RNBx), 2007 WL 4592113 (C.D. Cal. Oct. 15, 2007) (certifying a plaintiff class despite noting the potential for disproportionate and enormous liability).

By contrast, the one federal court of appeals to have addressed this issue in the context of the FCRA rejected *Ratner*'s reasoning. *See Murray v. GMAC Mort. Corp.*, 434 F.3d 948 (7th Cir. 2006). There, the Seventh Circuit reversed the district court's denial of class certification, holding that considering a defendant's potential enormous liability in the Rule

---

[5]It is somewhat ironic that *Ratner* has played such a prominent role in shaping the scope of the Rule 23 superiority analysis. The district judge there specifically distanced himself from the "sweeping pronouncements" about the role of Rule 23 made by the respective parties, and instead emphasized his "molecular purpose" to rule only on the "specific case at hand." 54 F.R.D. at 413.

23(b)(3) superiority analysis was improper. *Id.* at 953-54. Although that case did not involve an alleged violation of FACTA, the Seventh Circuit's analysis and conclusion are instructive because FACTA and other provisions of the FCRA share the same statutory damages provision, *see* 15 U.S.C. § 1681n. Accordingly, we discuss it in greater detail below.

AMC relies heavily on our opinion in *Kline v. Coldwell, Banker & Co.* to defend the district court's denial of class certification. In *Kline*, we considered an action brought against Los Angeles County real estate brokers who had allegedly conspired to fix brokerage commissions in violation of the Sherman Act. 508 F.2d at 228. The plaintiffs in that case estimated that, on the basis of 400,000 sales that occurred in Los Angeles County during the relevant class period, their collective injury potentially amounted to $250 million. *Id.* at 234 & n.5. They therefore claimed that they were entitled to approximately $750 million in damages under the treble damages provision of the Sherman Act. *Id.* The district court certified both a class of plaintiffs and of defendants, and an interlocutory appeal followed. *Id.* at 228-29. We reversed, holding that the action could not be maintained as a class action and that the district court abused its discretion in conducting its superiority analysis. *Id.* at 236.

Of the three justifications for our holding, one was our significant concern over the amount of damages that might be imposed jointly and severally on the individual defendants. *Id.* at 235. Specifically, we noted that, if the plaintiffs were successful, the defendants in the class would be jointly and severally liable for $750 million. *Id.* at 234. In reversing, we reasoned that, "when 2,000 [defendant class members] are joined in an action in which each is jointly and severally liable, the liability is increased in geometric progression. Such an award against each of 2,000 real estate broker defendants would shock the conscience" and lead to an "ad absurdum result." *Id.* at 234-35. We further noted that " 'the allowance of thousands of minimum recoveries like plaintiff's would

carry to an absurd and stultifying extreme the specific and
essentially inconsistent remedy Congress prescribed as the
means of private enforcement.' " *Id.* at 234-35 (quoting *Rat-
ner*, 54 F.R.D. at 414). Thus, we held that a class action was
not the superior method of adjudicating the controversy. *Id.* at
235.

    *Kline*, AMC argues, created binding circuit precedent that
Rule 23(b)(3) permits consideration of the proportionality of
the potential liability. That is an overbroad reading of *Kline*.
The basis of *Kline*'s conclusion was not simply that potential
liability would be disproportional to the harm incurred, but
rather that such liability would be inconsistent with congres-
sional intent in enacting the statutory damages provision. As
*Kline* explains, the treble damages provisions in the Clayton
and Sherman Acts act as statutory punitive measures in which
" 'two thirds of the recovery is not remedial and inevitably
presupposes a punitive purpose.' " *Id.* (quoting *Lyons v. Wes-
tinghouse Elec. Corp.*, 222 F.2d 184, 189 (2d Cir. 1955)).
Thus, we concluded:

>     The *intent of Congress* under section 4 of the Clay-
> ton Act, 15 U.S.C. [§ ] 15, appears to have been to
> impose punishment upon the violator of section 1 of
> the Sherman Act for his own malefactions[,] not to
> subject him to vicarious liability by the coincidence
> of a class action for the staggering damages of the
> multitude.

*Id.* (emphasis added). That conclusion about congressional
intent was particularly sound given that the Clayton and Sher-
man Acts were enacted before the Supreme Court created the
presumption that class actions are available unless Congress
expressed its contrary intent. *See Califano v. Yamasaki*, 442
U.S. 682, 700 (1979) ("In the absence of a direct expression
by Congress of its intent to depart from the usual course of
trying 'all suits of civil nature' under the Rules established for
that purpose, class relief is appropriate in civil actions brought

in federal court . . . ."). Accordingly, Congress would not nec-
essarily have expected class actions to be available when it
created the statutory damages provisions in the Clayton and
Sherman Acts, and, unlike here, the *Kline* panel could not
assume as much.

[3] The court in *Ratner* also focused on whether the poten-
tially enormous liability would be consistent with congressio-
nal intent in creating the statutory damages provision. *See* 54
F.R.D. at 414 ("[T]he allowance of thousands of minimum
recoveries like plaintiff's would carry to an absurd and stulti-
fying extreme the specific and essentially inconsistent remedy
*Congress prescribed* as the means of private enforcement."
(emphasis added)). We think it clear that the Rule 23(b)(3)
superiority analysis must be consistent with the congressional
intent in enacting a particular statutory damages provision.
While Rule 23 affords district courts "wide discretion" in
deciding whether to certify a class, *Dukes v. Wal-Mart Stores,
Inc.*, 603 F.3d 571, 594 (9th Cir. 2010) (en banc), the district
court was obliged to exercise that discretion in light of the
objectives of FACTA. *Cf. Hecht Co. v. Bowles*, 321 U.S. 321,
331 (1944) (holding that, in considering whether to impose an
injunction under the Emergency Price Control Act, the district
court's discretion "must be exercised in light of the objectives
of the Act"); *Thorne v. City of El Segundo*, 802 F.2d 1131,
1133 (9th Cir. 1986) ("Although the district court has wide
discretion in fashioning appropriate Title VII remedies, that
discretion must be exercised in light of the objectives of Title
VII . . . ."); *see also Albemarle Paper Co. v. Moody*, 422 U.S.
405, 416 (1975) (noting that a decision calling for the exercise
of discretion "hardly means that it is unfettered by meaningful
standards or shielded from thorough appellate review"); *Wat-
kins v. Simmons & Clark, Inc.*, 618 F.2d 398, 402 (6th Cir.
1980) (noting that while " '(s)tudents of [Rule 23] have been
led generally to recognize that its broad and open-ended terms
call for the exercise of some considerable discretion of a prag-
matic nature,' that discretion must often be limited by consid-

erations in addition to those set forth in the Rule" (quoting *Ratner*, 54 F.R.D. at 416)).

**[4]** Therefore, in accord with these principles and *Kline*'s reasoning, we look to FACTA itself for evidence of congressional intent as to the appropriateness of class certification in such cases. Specifically, we must examine FACTA to determine whether the denial of class certification is consistent with congressional intent and FACTA's remedial scheme where a district court concludes that potential liability is disproportionate to any actual harm.

### 1.  Background on FACTA

**[5]** In an effort to combat identity theft, in 2003 Congress enacted FACTA, which amended the FCRA, 15 U.S.C. §§ 1681-1681x. *See* Pub. L. 108-159, 117 Stat. 1952 (2003). FACTA provides, in relevant part, that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g)(1). Congress imposed civil liability for willful noncompliance in the amount of "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000." *Id.* § 1681n(a)(1)(A). In addition, FACTA allows prevailing parties to recover attorneys' fees and costs. *Id.* § 1682n(a)(3).

In response to misunderstandings about the truncation requirements, Congress amended FACTA in 2008 with the Clarification Act. Apparently, a significant number of merchants had erroneously concluded that merely truncating the account number down to the last five digits while leaving the expiration date displayed would satisfy FACTA's requirements. *See* Clarification Act § 2(a)(3),122 Stat. at 1565. After the deadline for compliance passed, hundreds of lawsuits were filed alleging that the companies' failure to remove the

expiration date constituted willful violations of FACTA. *Id.* § 2(a)(4), 122 Stat. at 1565. In response, Congress amended the "willful noncompliance" requirement of FACTA to insulate from liability any person who printed an expiration date on a receipt between December 4, 2004, and June 3, 2008, so long as they otherwise complied with FACTA's requirements. *Id.* § 3(a), 122 Stat. at 1566 (codified at 15 U.S.C. § 1681n(d)). As expressly stated in the bill, the Clarification Act aimed "to ensure that consumers suffering from any actual harm to their credit or identity are protected while simultaneously limiting abusive lawsuits that do not protect consumers but only result in increased cost to business and potentially increased prices to consumers." *Id.* § 2(b), 122 Stat. at 1566.

### 2.   *Statutory Analysis of FACTA*

Unfortunately, neither FACTA nor the Clarification Act addresses the availability of class actions. Where a statute is silent on the availability of class relief, the Supreme Court has instructed that we presume it to be available in all "civil actions brought in federal court." *Califano*, 442 U.S. at 700. Accordingly, as neither FACTA nor the Clarification Act contain a "direct expression" to the contrary, we must presume that Congress intended class relief to be available. That, of course, does not mean that a court necessarily must allow a plaintiff to seek class relief. Rather, it means that a court cannot deny class certification where plaintiffs have otherwise met the requirements of Rule 23.

We therefore must decide whether a plaintiff satisfies Rule 23's requirements where certification of a class would threaten to impose liability disproportionate to the harm caused. As we have explained, the touchstone of this determination is whether denying class certification on this ground is consistent with congressional intent. We conclude that it is not.

**[6]** We begin, as always, with the plain language of the statute. *See United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999). The express terms of the statute provide that upon proving a willful violation,[6] a plaintiff may recover "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000." 15 U.S.C. § 1681n(a). Importantly, the statute does not place a cap on these damages in the case of class actions, does not indicate any threshold at which courts are free to award less than the minimum statutory damages, and does not limit the number of individuals that can be certified in a class or the number of individual actions that can be brought against a single merchant.

**[7]** Although the congressional record is silent about why Congress provided for statutory damages in these amounts,[7] we presume that the statutory damages serve a compensatory function. *See L.A. News Serv. v. Reuters Television Int'l., Ltd.*, 149 F.3d 987, 996 (9th Cir. 1998) (noting that awards of statutory damages can serve compensatory, punitive and/or deterrent purposes). That Congress provided a consumer the option of recovering either actual or statutory damages, but not both, supports the presumption that they serve the same purpose. We further note that Congress provided for punitive damages in addition to any actual or statutory damages, *see* 15 U.S.C § 1681n(a)(2), which further suggests that the statutory damages provision has a compensatory, not punitive, purpose. *See Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1312

---

[6]*See supra* footnote 2.

[7]Nor does the legislative history of the FCRA shed any light on the purpose of the statutory damages provision. No committee report accompanied the final bill. In fact, there was no discussion on how Congress arrived at the range of statutory damages or the appropriateness of that remedy. A 1993 Senate Report mentions that the civil liability provisions were added in order to assist consumers in "protect[ing] their privacy" and to "ensure the accuracy of information in their files." S. Rep. No. 103-209, at 6 (1993). That statement of purpose, however, does not speak to Congress's specific intent in enacting the remedial scheme.

(11th Cir. 2009) (concluding that, because FACTA provides separately for punitive damages, the statutory damages provision is not punitive).

The need for statutory damages to compensate victims is plain. The actual harm that a willful violation of FACTA will inflict on a consumer will often be small or difficult to prove. As the Seventh Circuit similarly noted in *Murray*, under the FCRA "individual losses, if any, are likely to be small—a modest concern about privacy, a slight chance that information would leak out and lead to identity theft. That actual loss is small and hard to quantify is why statutes such as the Fair Credit Reporting Act provide for modest damages without proof of injury." 434 F.3d at 953.

**[8]** In addition to that compensatory function, FACTA's actual and statutory damages provisions also effectuate the Act's deterrent purpose. *See L.A. News Serv.*, 149 F.3d at 996 (noting that statutory damages help "sanction and vindicate the statutory policy of discouraging infringement" (internal quotation marks omitted)). In fashioning FACTA, Congress aimed to "restrict the amount of information available to identity thieves." 149 Cong. Rec. 26,891 (2003) (statement of Sen. Shelby). Allowing consumers to recover statutory damages furthers this purpose by deterring businesses from willfully making consumer financial data available, even where no actual harm results.

**[9]** The factors that a court considers when assessing the superiority of a class action under Rule 23(b)(3) must be consistent with these dual purposes of FACTA's statutory damages remedy. *Cf. Kline*, 508 F.2d at 235 (concluding that class certification would be inconsistent with Congress's intent to limit punitive damages to an amount only three times the harm an individual defendant caused). Congress expressly created a statutory damages scheme that intended to compensate individuals for actual or potential damages resulting from FACTA violations, without requiring individuals to prove

actual harm. Thus, irrespective of whether Bateman and all the potential class members can demonstrate actual harm resulting from a willful violation, they are entitled to statutory damages. There is no language in the statute, nor any indication in the legislative history, that Congress provided for judicial discretion to depart from the $100 to $1000 range where a district judge finds that damages are disproportionate to harm. Further, we cannot surmise a principled basis for determining when damages are and are not "proportionate" to actual harm. Indeed, one might plausibly argue that a $1000 award, or even a $100 award, for a single violation of FACTA, without any allegation of harm, is not proportionate. But the plain text of the statute makes absolutely clear that, in Congress's judgment, the $100 to $1000 range *is* proportionate and appropriately compensates the consumer. That proportionality does not change as more plaintiffs seek relief; indeed, the size of AMC's potential liability expands at exactly the same rate as the class size. In the absence of any showing that courts have the discretion to modify this remedial scheme, we agree with the Seventh Circuit that "it is not appropriate to use procedural devices to undermine laws of which a judge disapproves." *Murray*, 434 F.3d at 954.

[10] To the extent that statutory damages also serve a deterrent purpose, a court undermines that purpose in denying class certification on the basis of the proportionality of actual harm and statutory liability. Congress, in its legislative judgment, specified the range of damages that it considered sufficient to have a deterrent effect. Despite Congress's awareness of the availability of class actions, it set no cap on the total amount of aggregate damages, no limit on the size of a class, and no limit on the number of individual suits that could be brought against a merchant. Allowing denial of class certification because of the sheer number of violations and amount of potential statutory damages would allow the largest violators of FACTA to escape the pressure of defending class actions and, in all likelihood, to escape liability for most violations. In other words, whatever risk of overdeterrence class certifi-

cation poses, refusing to certify a class on these grounds poses the risk of significant underdeterrence.

   To deny class certification based on the potential amount of damages as compared to the extent of harm presumes that Congress left it to the courts to evaluate the relative amount of liability necessary to serve the statute's compensatory and deterrent purposes. Despite the absence of anything in the text or legislative history of the statute explicitly delegating such authority, AMC suggests it can be inferred from language in the Clarification Act. Specifically, AMC points to the following language in the Clarification Act's "Findings" section:

> (4) Almost immediately after the deadline for compliance [with FACTA] passed, hundreds of lawsuits were filed alleging that the failure to remove the expiration date was a willful violation of the Fair Credit Reporting Act even where the account number was properly truncated.

> (5) None of these lawsuits contained an allegation of harm to any consumer's identity.

> (6) Experts in the field agree that proper truncation of the card number, by itself as required by the amendment made by the Fair and Accurate Credit Transactions Act, regardless of the inclusion of the expiration date, prevents a potential fraudster from perpetrating identity theft or credit card fraud.

> (7) *Despite repeatedly being denied class certification*, the continued appealing and filing of these lawsuits represents a significant burden on the hundreds of companies that have been sued and could well raise prices to consumers without corresponding consumer protection benefit.

Clarification Act § 2(a)(3),122 Stat. at 1565-66 (emphasis added). According to AMC, these findings evidence Con-

gress's approval of court rulings that denied class certification
on the ground that damages would be disproportionate to
actual harm. We disagree.

While some courts had denied class certification under
FACTA on superiority grounds at the time the Clarification
Act was enacted in June 2008, other courts had granted certi-
fication despite superiority arguments like AMC's. *See, e.g.*,
*Redmon v. Uncle Julio's of Ill., Inc.*, 249 F.R.D. 290 (N.D. Ill.
Mar. 7, 2008); *Reynoso v. S. Cnty. Concepts*, No. SACV07-
373-JVS (RCx), 2007 WL 4592119 (C.D. Cal. Oct. 15, 2007).
Because we must presume that Congress is aware of "past
judicial interpretations and practices" when it legislates, *In re
Egebjerg*, 574 F.3d 1045, 1050 (9th Cir. 2009), we must pre-
sume Congress was aware of this split among district courts
as to whether these types of actions should be certified. In the
midst of this disagreement, Congress stepped in to amend
FACTA, and yet did nothing to limit the availability of class
relief or the amount of aggregate damages. Had Congress
been sufficiently concerned about disproportionate damages
as a result of class actions, it would have limited class avail-
ability or aggregate damages. Yet Congress did nothing of the
sort and instead merely imposed a retroactive immunity for a
sub-class of merchants who misunderstood FACTA's require-
ments.

Where Congress in the past has been confronted with con-
cerns over disproportionate, potentially enormous statutory
damage awards, it has acted decisively to make its intent
clear. Responding to the problem identified in *Ratner*, Con-
gress amended TILA's civil liability provision in 1974. Act of
Oct. 28, 1974, Pub. L. No. 93-495, § 408(a), 88 Stat. 1500,
1518. As evidenced by the Report of the Senate Banking
Committee, Congress was aware of the potentially enormous
liability facing defendants where TILA claims were pursued
as class actions. In relevant part, that report stated:

> A problem has arisen in applying minimum liability
> provisions in class action suits involving millions of

consumers. If each member of the class is entitled to
a minimum award of $100, a creditor's liability can
be enormous.

. . .

The purpose of the civil penalties section under
Truth in Lending was to provide creditors with a
meaningful incentive to comply with the law without
relying upon an extensive new bureaucracy. How-
ever, the Committee feels this objective can be
achieved without subjecting creditors to enormous
penalties for violations which do not involve actual
damages and may be of a technical nature. Putting a
reasonable limit on a creditor's maximum class
action liability would seem to be in the best interests
of both creditors and consumers.

S. Rep. No. 93-278, at 14 (1973). Accordingly, Congress
added a provision to TILA limiting aggregate statutory dam-
ages. Act of Oct. 28, 1974 § 408(a), 88 Stat. at 1518 (codified
as amended at 15 U.S.C. § 1640(a)(2)(B)) (capping class
action damage awards at $500,000 or one percent of the
defendant's net worth). Congress has similarly capped class
action awards under other statutes. *See* 15 U.S.C.
§ 1692k(a)(2)(B) (setting the same limit under Fair Debt Col-
lection Practices Act). Yet here, faced with precisely the same
issue, Congress chose to remain silent and not to impose any
limits on aggregate relief.

We therefore are not convinced that this passing reference
to denial of class certification is sufficient to overcome the
plain text of the statute and congressional silence on the issue
of class relief, both of which strongly suggest that the propor-
tionality of the damages is an irrelevant consideration in
effectuating FACTA's compensatory and deterrence pur-
poses.

We also note an additional problem with AMC's position. AMC would have us leave it to the discretion of district courts to decide whether a potential award would be so disproportionate to the actual harm that a class action would not be the superior method of adjudication. Yet such unguided discretion results in decidedly non-uniform decisions about class certification. For example, in *Price v. Lucky Strike Entm't*, 2007 WL 4812281, a district court refused to certify a class of approximately 33,000 plaintiffs seeking damages under FACTA, none of whom had alleged any actual harm. Meanwhile, a different district court in the same district certified a class of approximately 32,000 individuals seeking statutory damages under FACTA who also had alleged no harm, concluding that "the magnitude of the potential damage award does not affect the superiority of a class action for adjudication of this dispute." *See Medrano v. WCG Holdings, Inc.*, No. SACV 07-0506 JVS (RNBx), 2007 WL 4592113, at *6 (C.D. Cal. Oct. 15, 2007). We cannot ascribe to Congress an intent to allow FACTA's deterrent and compensatory impact to vary according to the discretionary policy judgments of district judges.

**[11]** We therefore hold that the district court abused its discretion in considering the proportionality of the potential liability to the actual harm alleged in its Rule 23(b)(3) superiority analysis.

## B.   Enormous Liability

Having concluded that the proportionality of the potential liability to actual harm was an improper consideration under FACTA, we turn to the district court's second justification: that "class treatment would render the magnitude of the defendant's liability enormous." We hold that such a consideration is not an appropriate reason to deny class certification under Rule 23(b)(3).

It is widely accepted that class certification "may force a defendant to settle rather than incur the costs of defending a

class action and run the risk of potentially ruinous liability."
Fed. R. Civ. P. 23, Advisory Committee Notes to 1998
Amendments. Indeed, "[e]ven in the mine-run case, a class
action can result in 'potentially ruinous liability.' " *Shady
Grove*, 130 S. Ct. at 1465 n.3 (Ginsburg, J., dissenting) (quot-
ing Fed. R. Civ. P. 23, Advisory Committee Notes to 1998
Amendments); *see also Prado-Steiman ex rel. Prado v. Bush*,
221 F.3d 1266, 1274 (11th Cir. 2000) ("[E]ven ordinary class
certification decisions by their very nature may radically
reshape a lawsuit and significantly alter the risk-benefit calcu-
lation of the parties . . . ."); *Turoff v. Union Oil Co. of Cal.*,
61 F.R.D. 51, 54 (N.D. Ohio 1973) ("In many fields, ranging
from mortgage foreclosures to securities laws, the courts
enforce recoveries which result in bankruptcy without indulg-
ing in the legislative function of ruling that the law permitting
such a recovery could not have been intended to harm anyone
to such a degree.").

The decision to certify a class thus necessarily "places pres-
sure on the defendant to settle even unmeritorious claims."
*Shady Grove*, 130 S. Ct. at 1465 n.3 (Ginsburg, J., dissenting).
*See also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476
(1978) ("Certification of a large class may so increase the
defendant's potential damages liability and litigation costs
that he may find it economically prudent to settle and to aban-
don a meritorious defense."). We have held, however, that
"[t]he fairness of the pressure i.e., the sociological merits of
the small claims class action[,] is not a question for us to
decide." *Blackie v. Barrack*, 524 F.2d 891, 899 (9th Cir. 1975).[8]
*Accord Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 960
(9th Cir. 2005) (rejecting the notion that certification of a
large class creates pressure to settle that is *per se* unreason-

---

[8]Indeed, as the Supreme Court has noted, a defendant's "aggregate lia-
bility . . . does not depend on whether the suit proceeds as a class action,"
because "[e]ach of the . . . members of the putative class could . . . bring
a freestanding suit asserting his individual claim." *Shady Grove*, 130 S. Ct.
at 1443 (plurality op.).

able); *Klay*, 382 F.3d at 1275 ("Mere pressure to settle is not a sufficient reason for a court to avoid certifying an otherwise meritorious class action suit."); *In re Visa Check/Master Money Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001), *superseded by statute on other grounds as stated in Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 238 F.R.D. 82, 100 (S.D.N.Y. 2006) (holding that the sheer size of a class—and the concomitant size of liability—"alone cannot defeat an otherwise proper certification"). If the size of a defendant's potential liability alone was a sufficient reason to deny class certification, however, the very purpose of Rule 23(b)(3)—"to allow integration of numerous small individual claims into a single powerful unit"—would be substantially undermined. *Blackie*, 524 F.2d at 899.

[12] Rather, in accord with our reasoning under *Kline*, whether the potential for enormous liability can justify a denial of class certification depends on congressional intent. For substantially the same reasons discussed in Part III.A, we conclude that allowing consideration of the potential enormity of any damages award would undermine the compensatory and deterrent purposes of FACTA. As the Seventh Circuit noted, the reason that damages can become enormous under FACTA "does not lie in an 'abuse' of Rule 23; it lies in the legislative decision to authorize awards as high as $1,000 per person," combined with multiple violations of the statute. *Murray*, 434 F.3d at 953. Nothing in the plain text of the statute or in its legislative history suggests that Congress intended to place a cap on potentially enormous statutory awards or to otherwise limit the ability of individuals to seek compensation. Had Congress so intended, the Clarification Act represented a prime opportunity for Congress to clarify its intent given that this issue was already a matter of heavy debate in the courts at the time of the Amendment. *See, e.g.*, *Redmon*, 249 F.R.D. at 296-97; *Reynoso*, 2007 WL 4592119, at *5-6. Indeed, as noted above, when Congress has been concerned about the enormity of potential liability in cases like this one, it has placed caps on aggregate liability. *See, e.g.*, 15 U.S.C.

§ 1640(a)(2)(b) (placing a cap on aggregate recovery under TILA); 15 U.S.C. § 1692k(a)(2)(B)(ii) (placing a cap on aggregate recovery under the Fair Debt Collection Practices Act).

**[13]** In the absence of such affirmative steps to limit liability, we must assume that Congress intended FACTA's remedial scheme to operate as it was written. To limit class availability merely on the basis of "enormous" potential liability that Congress explicitly provided for would subvert congressional intent.

We note, however, that this is not a case where the defendant has argued or demonstrated that the potential liability would result in bankruptcy. In the context of Rule 23(f), which allows for interlocutory appeal of class certification decisions in some circumstances, we have required an appellant to demonstrate that the potential liability would be "ruinous" before granting interlocutory appeal. *See Chamberlan*, 402 F.3d at 960-61 (noting that interlocutory appeal is not warranted merely because the potential liability would be " 'unpleasant to a behemoth' company" (quoting *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 294 (1st Cir. 2000)); Fed. R. Civ. P. 23, Advisory Committee Notes to 1998 Amendments, Subdivision (f). Here, AMC did not argue before the district court that the potential $290 million liability would put it out of business, nor did it submit any declarations, documents, or other evidence demonstrating that such liability would be "ruinous." Bateman, however, submitted evidence that AMC's 2006 revenues were approximately $1.68 billion, with approximately $1.66 billion in costs and expenses. Bateman also submitted evidence showing that AMC's assets were worth approximately $4 billion as of 2007. We reserve judgment as to whether a showing of "ruinous liability" would warrant denial of class certification in a FACTA or similar action.

**[14]** We also reserve judgment as to whether, if Bateman prevails at trial, the district court may be entitled to reduce the

award if it is unconstitutionally excessive. *See Murray*, 434
F.3d at 954 ("An award that would be unconstitutionally
excessive may be reduced, *see State Farm Mut. Auto. Ins. Co.
v. Campbell*, 538 U.S. 408 (2003), but constitutional limits are
best applied after a class has been certified."). We do, how-
ever, conclude that is it not appropriate to evaluate the exces-
siveness of the award at this stage of the litigation. Because
we do not know what amount of damages Bateman will seek
nor how many individuals will ultimately claim the benefit of
any damages awarded should plaintiffs prevail, any evaluation
of AMC's potential liability at this time is unduly speculative.

### C.  Good Faith Compliance

[15]  In conducting its Rule 23(b)(3) analysis, the district
court also concluded that a class action would not be a supe-
rior method of adjudication because AMC "demonstrated
good faith by complying with FACTA within a few weeks of
the filing of Plaintiff's Complaint. This limits the deterrent
effect of a class action." We hold that the district court's con-
sideration of AMC's post-complaint good faith compliance
was inconsistent with congressional intent in enacting
FACTA. Congress did not include any safe harbor or other-
wise limit damages for good faith compliance with the statute
after an alleged violation. The mere fact that AMC changed
the content of its receipts to comply with FACTA after the
lawsuit was filed does not suggest that certification of the
class would have limited deterrent effect. To the contrary, we
are quite sure that certification of a class here would preserve,
if not amplify, the deterrent effect of FACTA. Because Bate-
man's complaint clearly alleged that he was seeking class-
wide damages, we can reasonably surmise that AMC's speedy
compliance with FACTA was promoted, at least in part, by
the specter of a substantial damages award. Thus, to deny
class certification on this ground would communicate to other
potential violators that, as long as they comply with FACTA
after a complaint is filed, they may avoid liability for wide-
spread violations. In other words, to deny class certification

on this ground undermines the deterrent effect of FACTA itself.

## IV

As Judge Easterbrook of the Seventh Circuit mused, "[m]aybe suits such as this will lead Congress to amend the [statute]; maybe not. While a statute remains on the books, however, it must be enforced rather than subverted." *Murray*, 434 F.3d at 954. Thus, in light of the foregoing discussion, the district court's order denying class certification is vacated, and the case is remanded for proceedings consistent with this opinion. Nothing in this opinion should be construed to limit the district court's ability to consider other Rule 23(a) and 23(b) factors, including the manageability of a nationwide class, in deciding whether class certification is appropriate.

**REVERSED AND REMANDED.**